******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

Elgo, Alexander and Suarez, Js.

*Syllabus*

The defendants appealed to this court from the judgment of the trial court granting the plaintiffs' motion for contempt. The defendants owned property that was located in the plaintiff town. In 2009, the plaintiffs commenced the underlying action seeking injunctive relief to compel the defendants to comply with certain zoning regulations. The parties entered into a joint stipulation, which, inter alia, prohibited the defendants from selling or having taken from the property by truck, or in any way removing from the property any soil, sand, gravel, clay, rock, or other earth material, and the trial court rendered judgment in accordance with the stipulation. Thereafter, the plaintiffs filed several postjudgment motions for contempt alleging that the defendants had violated the terms of the stipulated judgment. The trial court granted the plaintiffs' first motion, filed in 2011, and entered certain orders. Following the plaintiffs' second motion for contempt, filed in 2013, the trial court ordered the parties to conduct periodic meetings at the property to monitor the defendants' compliance with the judgment. When the town was satisfied that the defendants were in compliance with the judgment, the plaintiffs withdrew their motion. In 2018, the plaintiffs received several complaints about noise and excess truck traffic on the property. In response, the plaintiffs took aerial photographs of the property in January, 2019, which depicted construction equipment and stockpiles of construction materials on the property. The plaintiffs filed their third motion for contempt, the resolution of which served as the basis for the present appeal. The court found that the defendants had wilfully violated the judgment by using the property for commercial rock mining and construction related operations and they had concealed their noncompliance with the judgment. The court granted the motion and imposed sanctions against the defendants, including a $13,800 fine, a conditional fine of $100 per day until the defendants purged their contempt by restoring the property to its prior condition, and injunctive relief ordering, inter alia, that the defendants remove any improperly buried materials from the site. *Held*:

1. Contrary to the defendants' claim, the trial court's finding that the defendants had violated the terms of the stipulated judgment by engaging in commercial mining and construction related operations on the property was not clearly erroneous: the court's finding was supported by the evidence presented at the hearing on the motion for contempt, specifically, the photographs of the property that showed the use of certain construction equipment and stockpiles of construction materials, and testimony from the town's land use enforcement officer about the condition of the property; moreover, it was apparent from the court's decision that it doubted the defendants' credibility and, instead, chose to credit the evidence presented by the plaintiffs, which it was entitled to do as the trier of fact.

2. This court concluded that the trial court did not abuse its discretion in imposing sanctions related to its finding of contempt, this court having considered the defendants' wilful and continued violation of the judgment, the defendants' efforts to conceal their noncompliance with the judgment, and the purpose of the sanctions, which was to ensure the defendants' future compliance with the judgment.

Argued October 18, 2021—officially released March 15, 2022

*Procedural History*

Action seeking temporary and permanent injunctions ordering the defendants to comply with certain zoning regulations, and for other relief, brought to the Superior Court in the judicial district of Danbury, where the

court, *Maronich, J.*, rendered judgment in accordance with the parties' stipulation; thereafter, the court, *Krumeich, J.*, granted the plaintiffs' motion for contempt, and the defendants appealed to this court. *Affirmed.*

*David V. DeRosa*, for the appellants (defendants).

*Alexander Copp*, with whom, on the brief, was *Joseph G. Walsh*, for the appellees (plaintiffs).

*Opinion*

SUAREZ, J. The defendants, Gary Gaydosh, Barbara Gaydosh, and Justin Gaydosh, appeal from the judgment of the trial court granting the motion for contempt filed by the plaintiffs, the town of Newtown (town) and its zoning enforcement officer, Gary Frenette,[1] for the defendants' alleged violation of a stipulated judgment entered into by the plaintiffs and the defendants and rendered by the court to remedy zoning violations on the defendants' property. On appeal, the defendants claim that (1) the court's finding that they had violated the terms of the judgment was not supported by the evidence and (2) the court abused its discretion with respect to the sanctions imposed as a result of its finding of contempt. We affirm the judgment of the trial court.

The following facts, which are ascertained from the record and the trial court's memorandum of decision, and procedural history are relevant to this appeal. At all relevant times, the defendants owned real property known as 90A Huntington Road in Newtown (property). In July, 2009, the plaintiffs brought a zoning enforcement action against the defendants, alleging that the defendants were committing various zoning violations on the property. The plaintiffs alleged that the defendants had violated §§ 8.08.210, 8.03.722, and 1.06.1000 of the Newtown Zoning Regulations (regulations). Specifically, the plaintiffs alleged that the defendants had (1) "conducted, or allowed to [be] conducted, the excavation, processing, addition and removal of soil, rock, or other earth material on the property," in violation of § 8.08.210;[2] (2) "caused or allowed dump trucks and other vehicles not permitted in the residential zone to be parked or stored on the property," in violation of § 8.03.722;[3] and (3) "caused or allowed the dissemination of noise or vibration beyond the property lot," in violation of § 1.06.1000.[4] The plaintiffs sought temporary and permanent injunctive relief to compel the defendants to comply with the relevant provisions of the regulations, as well as fines and attorney's fees pursuant to General Statutes § 8-12.[5]

To resolve the complaint, the parties entered into a joint stipulation. The written stipulation prohibited the defendants from "bring[ing] onto [the] property from other locations, or hav[ing] or allow[ing] others to bring onto [the property] any soil, sand, gravel, clay, rock, or earth material . . . ." (Citation omitted.) It also prohibited the defendants from "bring[ing] or hav[ing] delivered any type of manure to [the] property unless used as fertilizer for new greenhouses or for growing crops." Under the stipulation, the defendants also were not permitted to "sell or have taken from [the] property by truck, or in any way remove from [the property] any soil, sand, gravel, clay, rock, or other earth material . . . ." (Citation omitted.)

The stipulation, however, did permit the defendants to compost and sell material in accordance with a Department of Environmental Protection Comprehensive Nutrient Management Plan. Such a plan subsequently was prepared in April, 2011, for the Department of Environmental Protection by Joseph E. Polulech.[6] The stipulation also permitted the defendants to conduct farming activities, but it specifically prohibited "the processing, stockpiling, or sale of any materials not associated with farming other than composted waste produced directly as a byproduct of the housing of horses and livestock" on the property. The stipulation further prohibited "the mixing, screening, crushing, blending, or combining of materials other than those allowed for composting operations in an approved Comprehensive Nutrient Management Plan . . . ." Finally, with respect to vehicles and machinery, the stipulation provided that "[t]he storage or parking of any piece of construction equipment, dump truck and other heavy truck of a type not ordinarily used as a means of transportation for people is not permitted on . . . this property, in this residential zone . . . . The use of operable motor vehicles normally used on farms for farming activities is permitted . . . . The defendants will not store or park any piece of construction equipment, dump truck and other heavy truck of a type not ordinarily used as a means of transportation for people on . . . this property unless used on the farm for farming activities after April 15, 2011." (Citations omitted.) On March 4, 2011, the court, *Maronich, J.*, rendered judgment in accordance with the parties' stipulation.

On June 8, 2011, the plaintiffs filed a motion for contempt against the defendants, alleging that the defendants had violated the terms of the stipulated judgment. On March 2, 2012, following several days of hearings, the trial court, *Wenzel, J.*, issued a memorandum of decision granting the motion for contempt, in which it found that the defendants wilfully had violated the judgment. To remedy the violation, the court ordered the defendants to maintain a written record of the entry and departure of trucks from the property and to present the record to the town on a monthly basis. The court also awarded costs and attorney's fees to the plaintiffs.

On December 3, 2013, the plaintiffs filed another motion for contempt, alleging that the defendants had continued to violate the judgment. Following a hearing, the trial court, *Roraback, J.*, ordered that the parties conduct periodic meetings at the property to monitor the defendants' compliance with the judgment. The parties held these meetings for eighteen months, during which time the town was satisfied that the defendants were in compliance with the judgment. On October 5, 2016, the plaintiffs withdrew the contempt motion.

In 2018, the plaintiffs became concerned that the

defendants had resumed conducting prohibited activities on the property. In response to several neighbors' complaints about noise and excess truck traffic on the property, the plaintiffs flew a drone over the property to take aerial photographs on January 4, 2019. According to the plaintiffs, the photographs suggested that the defendants were once again using the property for commercial mining and construction operations in violation of the judgment.

Relying on the photographs, the plaintiffs filed another motion for contempt against the defendants on January 15, 2019, the resolution of which is the subject of the present appeal. In the motion, the plaintiffs specifically alleged that the defendants had violated the judgment by (1) conducting "[e]xtensive screening and processing of various materials"; (2) conducting "[e]xtensive stockpiling of wood, stumps, asphalt pieces and millings"; (3) engaging in "[n]umerous and extensive excavation creating ponds"; (4) stockpiling various materials associated with mining; (5) using the property as a landfill; and (6) storing construction equipment and heavy trucks on the property. The plaintiffs sought an order to correct the violations, as well as fines and attorney's fees.

On February 11, 2019, a hearing on the motion for contempt was held before the trial court, *Krumeich, J.* Although notice of the hearing was duly provided to the defendants, they did not appear at the hearing. During the hearing, the plaintiffs presented the testimony of Steve Maguire, a land use enforcement officer for the town. Maguire testified that, during the months that preceded the hearing, he had received multiple complaints concerning the property. Maguire further testified that, after receiving several complaints, he used a drone that was borrowed from the Newtown Police Department to take aerial photographs of the property to determine the nature of the activities that were being conducted on the property. The photographs were entered into evidence at the hearing.

On the basis of the photographs, Maguire determined that a large portion of the property was being used for a commercial mining operation. During his testimony, Maguire described the operation to include material processing, the sale and transport of gravel, sand, and soil, and the dumping and burying of material. Maguire explained that the photographs depict "large earth excavations" as well as areas where stumps and debris have been buried. He also noted that the photographs show "extensive sorting machines which process out stone, sand, [and] soil" and multiple excavators. He characterized the property as a "large scale commercial operation which is in no way a farming operation including composting of manure." Maguire testified that the farming operation that he observed in previous inspections was too small to necessitate the equipment that was being used on the property in January, 2019, as depicted in

the drone photographs. With respect to composting, Maguire testified that the windrows[7] that were previously on the property had been replaced with the excavation and sorting area. The plaintiffs asked the court to find the defendants in contempt and to impose daily fines and issue an order requiring the defendants to submit to a physical inspection of the property.

Following the hearing, but before the court reached a decision, the defendants moved to reargue and open the evidence on the ground that their counsel had mistakenly thought that the hearing was scheduled for a different date. On February 20, 2019, the court granted the motion and opened the evidence to permit the defendants to cross-examine Maguire and to present evidence. Accordingly, the court scheduled an additional hearing to occur on April 8, 2019.

Prior to that hearing, on February 28, 2019, the plaintiffs filed a motion to inspect the defendants' property. The court granted the motion on that same day, finding that there was probable cause to believe that there may be a zoning violation on the property. The defendants objected to the plaintiffs' request to inspect the property and asked the court to continue the hearing that was scheduled for April 8, 2019, but the court denied their requests. On Friday, April 5, 2019, Maguire was permitted to inspect the property.

At the hearing on April 8, 2019, the court permitted both the plaintiffs and the defendants to present evidence. Maguire testified on behalf of the plaintiffs concerning his April 5, 2019 inspection of the property. The plaintiffs also entered into evidence photographs of the property that were taken during the April 5, 2019 inspection. Maguire described the January 4, 2019 aerial photographs to show large piles of asphalt, concrete, and stumps, which are not consistent with composting. Maguire testified that it appeared that the property was being used as a construction and materials processing site. During his testimony, he also compared photographs taken in 2014, when the defendants' compliance with the judgment was being monitored, to the January 4, 2019 and the April 5, 2019 photographs. Maguire opined that the 2014 photographs depicted a legitimate composting operation, while the January 4, 2019 photographs depicted an excavation business and the April 5, 2019 photographs depicted only "some" composting operations with a couple of windrows that were "freshly . . . turned over."

Gary Gaydosh also testified at the hearing. He testified that he was conducting only farming and composting operations on the property. He explained that the heavy machinery on the property was used to mix the windrows as part of the composting process. He further explained that the stone that Maguire observed "comes from when you scrape . . . the manure off the fields . . . ." When manure is scraped off the fields, "stones

get mixed up with the hay . . . the compost, the shavings, the chips." He testified that, because he is not permitted to sell the stones, he stockpiles the stones that get pulled up from the ground when manure is scraped off the fields.

On May 30, 2019, the court, in a detailed memorandum of decision, granted the plaintiffs' January 15, 2019 motion for contempt. The court found in relevant part: "The aerial photographs taken on January 4, 2019, show a large scale nonfarming operation in violation of zoning laws and the judgment. These photographs confirmed the citizen complaints to the town that there was excessive noise and truck traffic to and from the site because of commercial operations not permitted under the judgment and contrary to the zoning law. The defendants offered no evidence to back their assertion the heavy truck traffic was from normal farming operations. The photographs show use of construction equipment on the site, including six different excavators, large sorting equipment, several dump trucks and payloaders, that are placed consistent with use of the site for commercial mining and construction related operations. The photographs and credible testimony show the property has been used for commercial rock mining, with a pool dug for cleaning rock quarried from the property. The credible evidence also indicates the site has been used in connection with defendant Justin Gaydosh's JMB construction business for sorting, screening, and cleaning of materials from off-site and storage in stockpiles of construction materials including fill, wood, stumps, sand and gravel, storage of asphalt millings, including large pieces of asphalt, beyond the amount of asphalt millings that could be anticipated for patching and filling the farm roads. There is also credible evidence that there has been burial of materials imported into the site, including large logs, stumps and asphalt, which is consistent with use of the site as a transfer station. The January photographs do not show a large composting operation; the composting windrows . . . Maguire had observed on previous site visits in 2014–2015 were missing. The January, 2019 photographs show excavation of the site for commercial mining and construction, not a composting operation.

"The April 5, 2019 photographs produced by the town and April 7, 2019 photographs produced by the defendants show that the site has been materially changed by covering over the previous conditions with soil, wood chips, and composting materials. Subsurface holes shown on the January photo[graphs] have been filled in. Mounds of rock and other material dug from the earth that were shown in the January photographs have been flattened and covered with dirt. Logs and stumps that were stockpiled in January have been removed and covered over with soil. Other piles of asphalt in excess of that needed to maintain farm roads and stumps remained on-site. Windrows have been constructed

where none were shown in January. Equipment that was there in January was moved off-site and other pieces of equipment were repositioned and placed to make it appear they were used for composting. The defendants' clean-up efforts were obviously to recreate conditions that existed in 2014, when the town has last inspected the premises and the defendants' composting operation. The cover-up activities were not good faith efforts to comply with the judgment or to purge contempt but were rather short-term measures designed to thwart the inspection ordered by the court and to deceive the court that the defendants' contumacious conduct had ceased.

"The credible evidence reveals that the defendants used the delay occasioned by their failure to appear at the February 11, 2019 [hearing] to cover over evidence of their violation of the zoning laws and judgment. The defendants' violation of the judgment and their conduct to cover up the violations were wilful violations of the judgment for which they are held in contempt. The court is convinced [that the] defendants will continue their violation of the judgment unless cited for contempt and compelled to purge their contempt by discontinuing nonpermitted operations and removal of construction materials and excess asphalt and wood piles from the site. In addition, the site shall be subject to periodic inspections to monitor compliance with zoning laws. Unless there is continued monitoring and consequences from noncompliance with the judgment the court is convinced the defendants will resume their pattern of noncompliance and dissembling. Further, the court is mindful that the town should not bear the financial burden of continued monitoring of the defendants' activities.

"The defendants' wilful violation of the judgment and their circumvention of prior inspection orders requires periodic inspections to ensure compliance with the zoning laws and judgment. The judgment had provided for the defendants to provide notice to [the town] when more than three trucks were expected to enter or exit the property and allowed [the town] to visually inspect any truck entering or exiting the property at any time. This judgment remains in effect. Judge Roraback's order for periodic inspections was entered in response to a motion for contempt and, although it held for eighteen months, was inadequate to ensure continued compliance after the inspections were discontinued." (Footnotes omitted.)

After setting forth its findings, the court noted that, "[i]n light of the contumacious conduct described above, and the defendants' resistance to reasonable inspection by zoning officials, a more rigorous inspection plan is required to ensure compliance with zoning laws and the judgment." The court ordered the following measures: "The town is permitted to take aerial photographs of the

portion of the property where the violations occurred, without prior notice to the defendants. Periodically, municipal agents are entitled to enter the property on any weekday during regular business hours to inspect for compliance with the above, without prior notice to the defendants. The defendants shall resume providing notice of truck activity as provided in the judgment and the monthly recording and reporting truck activity to the town as ordered by Judge Wenzel.

"The defendants are fined $150 per day for the period [of] January 4, 2019, to April 5, 2019 . . . for a total fine of $13,800 related to their wilful violation and cover-up of violations of the judgment. The defendants are fined $100 per day from April 6, 2019, until they purge their contempt by removal of the excess asphalt, stumps and construction materials stored or buried on the site and the removal of equipment not used in permitted farming or composting activities. The defendants shall inform the town which vehicles on-site are used in such permitted operations on or before June 15, 2019. The defendants shall designate initially the piles of wood and asphalt the defendants assert is for farm use, and the parties shall confer as to any vehicles or excess material that shall be removed from the site. If the parties are unable to agree as to the vehicles and excess material to be removed, the court will decide the issue after a hearing. The defendants will dig test holes at their expense in the areas where the town suspects they have buried materials not permitted under the judgment and shall remove any improperly buried materials from the site. The town's agents shall be present when test holes are dug and for the removal of any prohibited material.

"On or before July 15, 2019, the defendants shall deposit $10,000 in an account to be held in escrow by an agent designated by the town, which shall be used to defray the town's cost of continued inspections and enforcement of this order." This appeal followed.

I

The defendants first claim that the evidence did not support the court's finding that they had "engaged in mining, commercial sales of materials, or anything other than the sale of composted material . . . ." We do not agree.

We begin by setting forth the legal principles and standard of review relevant to this claim. "The court has an array of tools available to it to enforce its orders, the most prominent being its contempt power. . . . Our law recognizes two broad types of contempt: criminal and civil. . . . Civil contempt . . . is not punitive in nature but intended to coerce future compliance with a court order, and the contemnor should be able to obtain release from the sanction imposed by the court by compliance with the judicial decree. . . . A civil

contempt finding thus permits the court to coerce compliance by imposing a conditional penalty, often in the form of a fine or period of imprisonment, to be lifted if the noncompliant party chooses to obey the court. . . .

"To impose contempt penalties . . . the trial court must make a contempt finding, and this requires the court to find that the offending party wilfully violated the court's order; failure to comply with an order, alone, will not support a finding of contempt. . . .

"We review the court's factual findings in the context of a motion for contempt to determine whether they are clearly erroneous. . . . A factual finding is clearly erroneous when it is not supported by any evidence in the record or when there is evidence to support it, but the reviewing court is left with the definite and firm conviction that a mistake has been made." (Citations omitted; internal quotation marks omitted.) *Wethersfield* v. *PR Arrow, LLC*, 187 Conn. App. 604, 652–53, 203 A.3d 645, cert. denied, 331 Conn. 907, 202 A.3d 1022 (2019).

The defendants argue that the evidence did not support a finding that they "engaged in mining, commercial sales of materials, or anything other than the sale of composted material . . . ." We disagree and conclude that the court's findings with respect to the defendants' activities on their property were not clearly erroneous.

At the hearing, Maguire testified about the conditions of the property on January 4, 2019, on the basis of the aerial drone photographs, and April 5, 2019, on the basis of his physical inspection. In concluding that the defendants had violated the judgment, the court found the observations and conclusions made by Maguire to be credible and reliable. The court began by finding that "the aerial photographs taken on January 4, 2019, show a large scale nonfarming operation in violation of zoning laws and the judgment." The court explained that the photographs show the "use of construction equipment on the site, including six different excavators, large sorting equipment, several dump trucks and payloaders . . . ." The court noted that the use of this type of machinery is "consistent with use of the site for commercial mining and construction related operations."

The court referred explicitly to the credibility of the evidence presented by the plaintiffs. The court found that the "photographs and credible testimony show the property has been used for commercial rock mining . . . ." Further, the court found that the "credible evidence also indicates the site has been used in connection with defendant Justin Gaydosh's . . . construction business for sorting, screening and cleaning of materials from off-site and storage in stockpiles of construction materials . . . ." There was also "credible evidence that there has been burial of materials imported into the

site, including large logs, stumps and asphalt, which is consistent with the use of the site as a transfer station." The court further found that the compost windrows that were previously observed during the property visits in 2014 and 2015 were gone, which indicated that the defendants were not engaged in a large composting operation.

Finally, on the basis of the April 5, 2019 photographs presented by the plaintiffs and the April 7, 2019 photographs presented by the defendants, the court found that the "credible evidence reveals that the defendants used the delay occasioned by their failure to appear at the February 11, 2019 [hearing] to cover over evidence of their violation of the zoning laws and judgment." It is apparent from the court's decision that the court doubted the defendants' credibility and instead chose to credit the evidence presented by the plaintiffs, which it was entitled to do as the trier of fact.

Our review of the record supports the court's conclusion that the defendants engaged in commercial mining and construction related operations. The defendants do not dispute that activities of this nature were prohibited by the judgment. The record also supports the court's conclusion that the defendants were not engaged in a permitted composting operation as they claimed to be. Because we determine that the evidence supports the court's findings, we conclude that the court's findings with respect to the defendants' activities on the property were not clearly erroneous.

II

The defendants next claim that the court abused its discretion with respect to the sanctions imposed as a result of its finding of contempt. That claim relates to the monetary sanction imposed for the defendants' contemptuous conduct occurring prior to April 6, 2019, the conditional sanction imposed upon them beginning on April 6, 2019, and the award of injunctive relief. We disagree that the court abused its discretion.

We first address the fine of $13,800, equal to $150 per day for the period of January 4, 2019, through April 5, 2019. With respect to this fine, the defendants appear to argue that the court abused its discretion in imposing the fine because the amount of the fine was excessive. The court explained that it imposed the sanction for the defendants' "wilful violation and cover-up of violations of the judgment." "The court has the power to fine one who has been found in contempt." *Friedlander* v. *Friedlander*, 191 Conn. 81, 86, 463 A.2d 587 (1983); see also *Tufano* v. *Tufano*, 18 Conn. App. 119, 125, 556 A.2d 1036 (1989). On appeal, orders imposing fines or sanctions related to a finding of contempt are reviewed under an abuse of discretion standard. See *Tufano* v. *Tufano*, supra, 125.

We note that, in *Friedlander*, the plaintiff filed five

separate contempt motions in order to rectify the defendant's continued violation of a postdissolution order. *Friedlander* v. *Friedlander*, supra, 191 Conn. 86. Despite the court's imposition of fines and other relief in connection with prior contempt motions, the defendant continued to violate the order. Id., 86–87. After granting the motion for contempt underlying the appeal in *Friedlander*, the trial court imposed a $1000 fine on the defendant as a sanction for his continued violation of the court's order. Id., 87. On appeal, the defendant argued that the fine was "arbitrary and capricious and excessive." Id., 86. Our Supreme Court, noting the defendant's history of noncompliance, concluded that the sanction did not reflect an abuse of discretion. Id., 86–87.

The rationale in *Friedlander* applies to the present claim. Here, when we consider the history of contempt motions filed by the plaintiffs and the history of violations found by the court, we are unable to conclude that the $13,800 fine imposed on the defendants reflected an abuse of discretion. The court found not only that the defendants had wilfully violated the judgment but also that the defendants had attempted to cover up the violations in an attempt to circumvent the court's order. The court found that the defendants' "cover-up activities were not good faith efforts to comply with the judgment or to purge contempt but were rather short-term measures designed to thwart the inspection ordered by the court and to deceive the court that the defendants' contumacious conduct had ceased." In an effort to achieve the defendants' compliance with the judgment rendered in the plaintiffs' favor, the plaintiffs filed three separate motions for contempt over the course of several years. These efforts were the direct result of the defendants' wilful and continued violation of the judgment. Given these facts, and especially the defendants' purposeful circumvention of the judgment, we are not persuaded that the court abused its discretion in issuing the fine.

The court also imposed on the defendants a conditional fine of $100 per day beginning on April 6, 2019, until they purged their contempt by restoring the property to its prior condition. "A civil contempt finding . . . permits the court to coerce compliance by imposing a conditional penalty, often in the form of a fine or period of imprisonment, to be lifted if the noncompliant party chooses to obey the court." (Internal quotation marks omitted.) *Wethersfield* v. *PR Arrow, LLC*, supra, 187 Conn. App. 652. As previously noted, on appeal, we review the propriety of the fines imposed for civil contempt pursuant to an abuse of discretion standard. See *Medeiros* v. *Medeiros*, 175 Conn. App. 174, 202, 167 A.3d 967 (2017). "The evaluation of civil contempt penalties depends to a great extent on whether the penalties are considered at the time they are first conditionally imposed for the purpose of coercing compliance or are

considered after the contempt has been purged and the penalties are finalized. When the penalties are first imposed, the propriety of the court's exercise of its discretion turns on the reasonableness of the amount of the coercion that the court deems necessary, keeping in mind the court's ultimate power to reduce the penalties once the contempt has been purged." *Papa* v. *New Haven Federation of Teachers*, 186 Conn. 725, 738, 444 A.2d 196 (1982).

Contrary to the defendants' contentions, this fine was clearly within the court's discretion. At the time that the conditional penalties were imposed, the contempt had not yet been purged. The purpose of the fine was to coerce compliance with the judgment. Considering the court's finding concerning the defendants' long history of noncompliance with the judgment and the defendants' continued efforts to hide their noncompliance, we are unable to conclude that the fines imposed on the defendants constitute an unreasonable amount of coercion. Thus, the defendants have not demonstrated that an abuse of discretion occurred.

We next address the defendants' challenge to the court's order of injunctive relief. "[T]he trial court's continuing jurisdiction to effectuate prior judgments . . . is not separate from, but, rather, derives from, its equitable authority to vindicate judgments. . . . [S]uch equitable authority does not derive from the trial court's contempt power, but, rather, from its inherent powers." (Emphasis omitted; internal quotation marks omitted.) *Wethersfield* v. *PR Arrow, LLC*, supra, 187 Conn. App. 653–54. "The issuance of an injunction and the scope and quantum of injunctive relief rests in the sound discretion of the trier. . . . [T]he court's ruling can be reviewed only for the purpose of determining whether the decision was based on an erroneous statement of law or an abuse of discretion." (Citation omitted; internal quotation marks omitted.) *FirstLight Hydro Generating Co.* v. *Stewart*, 328 Conn. 668, 685, 182 A.3d 67 (2018). "In determining whether there has been an abuse of discretion, every reasonable presumption should be given in favor of the correctness of the court's ruling. . . . Reversal is required only [when] an abuse of discretion is manifest or [when] injustice appears to have been done." (Internal quotation marks omitted.) *Wethersfield* v. *PR Arrow, LLC*, supra, 645.

In the present case, the court ordered injunctive relief requiring, inter alia, that the town be permitted to "dig test holes at [the defendants'] expense in the areas where the town suspects they have buried materials not permitted under the judgment and [ordered the defendants to] remove any improperly buried materials from the site." It is clear from the memorandum of decision that the purpose of the order was to determine whether the defendants were complying with the judgment and to ensure their future compliance. Consider-

ing the defendants' history of noncompliance, their prior efforts to conceal their noncompliance, and the clear purpose of the order to ensure compliance with and to effectuate the court's judgment, we conclude that the court did not abuse its discretion in imposing sanctions in the present case.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] For clarity, in this opinion we refer to the town of Newtown and Frenette collectively as the plaintiffs and individually by name. We also refer to Gary Gaydosh, Barbara Gaydosh, and Justin Gaydosh collectively as the defendants and, when necessary, individually by name.

[2] Section 8.08.210 provides: "No excavation, removal, grading, or addition of soil, loam, sand, gravel, clay, rock, or any other earth material upon land or premises not in public use in the Town of Newtown shall be commenced or conducted, except in accordance with and subject to the provisions of these regulations." Newtown Zoning Regs., § 8.08.210.

[3] Section 8.03.722 provides: "Outside storage of any piece of construction equipment, dump truck, garbage truck or other heavy truck of a type not ordinarily used as a means of transportation for people is prohibited in all zones." Newtown Zoning Regs., § 8.03.722.

[4] Section 1.06 provides: "The following uses, buildings or structures are specifically prohibited throughout all zones, even if only an accessory use . . . ." Newtown Zoning Regs., § 1.06.

Section 1.06.1000 describes the prohibited uses under § 1.06 to include the following: "Dissemination of smoke, dust, observable gas or fumes, noise, odor, vibration, or light beyond the lot on which the use is being conducted. Violation of the specific performance standards established by Article VIII, Section 10 of these regulations for the Industrial Zones in which they apply shall automatically be considered a violation of this section. This section may also be found to be violated in any zone where the Zoning Enforcement Officer finds the existence of the items listed in the first sentence of this section without regard to said performance standards." Newtown Zoning Regs., § 1.06.1000.

[5] General Statutes § 8-12 provides in relevant part: "If any . . . land has been used, in violation of any provision . . . of any bylaw, ordinance, rule or regulation made under the authority conferred hereby, any official having jurisdiction, in addition to other remedies, may institute an action or proceeding to prevent such unlawful . . . use or to restrain, correct or abate such violation . . . . The owner or agent of any building or premises where a violation of any provision of such regulations has been committed or exists . . . shall be fined not less than ten dollars or more than one hundred dollars for each day that such violation continues; but, if the offense is wilful, the person convicted thereof shall be fined not less than one hundred dollars or more than two hundred fifty dollars for each day that such violation continues . . . . If the court renders judgment for such municipality and finds that the violation was wilful, the court shall allow such municipality its costs, together with reasonable attorney's fees to be taxed by the court. . . ."

[6] Polulech is an engineer and the president of JEP Engineering Company, a private company that was hired to prepare the Comprehensive Nutrient Management Plan for the Department of Environmental Protection, now the Department of Energy and Environmental Protection.

[7] Maguire defined windrows as "basically long rows of material to be turned over throughout the year . . . to decompose and turn into essentially soil and compost."